LITTLE RIVER COUNTY (KINSEY v.). See Case No. 7,829.

LITTLE ROCK (GILCHRIST v.). See Case No. 5,421.

LITTLE ROCK (MERCHANTS' NAT. BANK v.). See Case No. 9,445.

LITTLE ROCK & FT. S. R. CO. (STEACY v.). See Case No. 13,329.

———

## Case No. 8,403.

### The LIVELY.

### [1 Gall. 315.] [1]

Circuit Court, D. Massachusetts. Oct. Term, 1812.

PRIZE—ILLEGAL CAPTURE—MEASURE OF DAMAGES—FREIGHT—CLAIM BY AGENTS—HEARING BY COMMISSIONERS OF EX PARTE EVIDENCE.

1. Captors have a right to carry their prizes to a proper and convenient port for adjudication, and are not controllable by the revenue officers. If they proceed irregularly, it is at the peril of damages. Case of illegal capture. What is the proper measure of damages in such case. When freight is a proper item of damage.

[Cited in U. S. v. The Nuestra Senora de Regla, 108 U. S. 103, 2 Sup. Ct. 293. Cited in brief in The Revere, Case No. 11,716.]

[Cited in brief in Dennis v. Maxwell, 92 Mass. 140.]

See The Nemesis, Edw. Adm. 51; The Speculation, 2, C. Rob. Adm. 293.]

2. Where, after an illegal capture, the vessel and cargo have been wholly lost, the prime cost and interest is the measure of damages. Freight not a proper item, where the voyage has not been lost by the capture. Supposed loss of profits no proper item of damage in a case of illegal capture.

[Cited in Pacific Ins. Co. v. Conard, Case No. 10,647; New Jersey Steam Nav. Co. v. Merchants' Bank, 6 How. (47 U. S.) 432; The Ocean Queen, Case No. 10,410; The Mary J. Vaughan, Id. 9,217; The Aleppo,

Id. 158; Dyer v. National Steam Nav. Co., Id. 4,225; Guibert v. The George Bell, 3 Fed. 585; The City of New York, 23 Fed. 619; Howard v. Stillwell & Bierce Manuf'g Co., 139 U. S. 199, 11 Sup. Ct. 503; Cincinnati S. L. Gas Illuminating Co. v. Western S. L. Co., 152 U. S. 200, 14 Sup. Ct. 525.]

[Cited in Coweta Falls Manuf'g Co. v. Rogers, 19 Ga. 416; Griffin v. Colver, 16 N. Y. 492. Cited in brief in Laurent v. Vaughn, 30 Vt. 93; Spring v. Haskell, 86 Mass. 112. Cited in Western Union Tel. Co. v. Graham, 1 Colo. 241; True v. International Tel. Co., 60 Me. 25; Western Gravel-Road Co. v. Cox, 39 Ind. 264.]

3. Where it is referred to commissioners to state the amount of damages in a case of illegal capture, the report should be special, and state the items of the allowances in detail.

4. Claims in prize causes should be made by the parties themselves, if within the jurisdiction, and not by mere agents. The captors have a right to the answers of claimants on oath.

[Cited in Re Stover, Case No. 13,507.]

5. If captors wantonly injure the captured crew, the prize court will award damages for personal ill-usage.

[Cited in Mendell v. The Martin White, Case No. 9,419.]

6. Where an injury is alleged to the cargo after it came to the possession of the captors, it should be ascertained under the direction of the prize court, by a survey and appraisement or sale.

7. Commissioners appointed to state damages should not hear ex parte evidence without notice to the other party.

The privateer Jefferson, commanded by Capt. Downie, on the 3d day of August, 1812, at a short distance from Machias river, captured the schooner Lively and cargo as prize, carried them into Machias, and from thence to Salem, where she arrived on the 12th of the same month. No proceedings having been had, the claimants on the 24th of the same month filed a libel for restitution in the district court, upon which a monition to proceed to adjudication issued against the captors, who in consequence thereof, on the 28th of August, libelled the property as prize; and, at a hearing in the district court upon the claims interposed, a decree of restitution passed without objection; and on the 1st of September, 1812, the district court also pronounced for damages to the claimants, and a reference was made to commissioners to ascertain and assess the amount. A report was accordingly made, which upon exceptions taken by the captors, was recommitted, and a new report was made, which, with the exception of the item of $76, was finally confirmed by the court, and decreed accordingly. The report was as follows:

To William Mooney, Owner of the Schooner.

| | |
|---|---|
| Freight of the vessel to Eastport.... | $161 00 |
| Amount of sundry articles taken from the vessel as by Capt. Downie's confession and certificate.............. | 76 86 |
| Demurrage, 38 days, at $5.......... | 190 00 |
| Men's wages and Mooney's time..... | 100 00 |
| Sundry expenses of Mr. Mooney..... | 67 50 |
| | $595 36 |

[1] [Reported by John Gallison, Esq.]

To Albigence Hayward and William Mooney, as Owners of the Cargo.

For the loss of profits which would have accrued, had the vessel proceeded to her destination.......... $624 00
Add for detention of property and other considerations ............. 76 00
                                                              _____
                                                              $700 00
                                                              ========

Assessors' fees going to Salem, and three meetings in Boston........... $60 00
Coach hire and travelling expenses.... 16 08
                                                              _____
                                                              $76 08

In the whole amounting to $1,371.44. To this sum the district court added for personal indignities and abuse,

To William Mooney................. $100 00
To Albigence Hayward............. 50 00
                                                      _____
                                                      $150 00

And the final decree awarded to Wm. Mooney $695.36, and to Albigence Hayward $674, in the whole amounting to $1369.36. From this decree the libellant interposed an appeal to this court. The vessel and cargo, however, were by consent restored. No examinations in preparatory had been taken. The whole crew left the prize at Machias, not choosing, for some irregularity or impropriety, to remain on board. The cause therefore came on to be heard upon the ship's papers, and upon affidavits taken by the parties.

From the ship's papers and other evidence it appeared that the schooner was purchased at the marshal's sale in Boston, on the 21st of July, 1812, by the claimant, William Mooney, for the sum of $115; and on the 30th of the same month was enrolled and licensed in his name at the custom-house in Boston for the coasting trade. Her cargo, consisting of meal, corn, flour, pork, crackers, ship-bread, vinegar, tea and gin, of the invoice value of $1052.12, was shipped by Hayward and consigned to Mooney, and by the papers destined for Eastport. On the 30th of July, 1812, the schooner, with her cargo on board, received a clearance at the custom-house, and sailed from Boston on a voyage to Eastport, having a crew consisting of Mr. Cole as master, Mr. Mooney as supercargo, and one seaman. The reasons assigned by Capt. Downie for the capture were, that the schooner was not truly described in her enrollment and license, being described as having a square stern, whereas she had a pink stern, and from some other appearances on the face of the papers he suspected them to be forged. Another reason assigned was, that, when hailed, the master answered that he was bound to Machias, and afterwards said he was bound for Eastport. Another reason, which seems to have been relied on, was the conduct of the schooner, which Capt. Downie thought indicated a design to trade with the enemy. On the arrival at Machias, the ship's papers were pronounced to be genuine and regular by the collector at that port, and the collector advised the vessel to be given up, but Capt. Downie refused, and sent her to Salem. It seemed now admitted that the stern of the vessel was neither square nor pink, but of a form between them, and she had been enrolled for several years by the same description.

Pitman, Cummings & Sprague, for captors.

C. Jackson, for claimants.

STORY, Circuit Justice. It has been contended upon the facts in this case, that there was probable cause of capture. But I am perfectly satisfied that there was no such cause; and if there had been any foundation for the pretences set up by the commander of the privateer, it was completely removed by the suggestions of the collector at Machias. It is certainly true, that the collector does not seem to have understood his own particular duty in all respects; for he seems to have interfered with a view to compel a restoration of the property, or at least a forcible detention of it at Machias. I know of no authority confided to a collector for this purpose. Courts of law are the proper tribunals to award restitution, and captors of prizes have a right to carry their prizes to a proper and convenient port for adjudication, and are not controllable by the revenue officers. If the captors proceed irregularly or improperly, they do it at their peril, and are answerable in damages. Still, however, it was easy for Capt. Downie to ascertain the genuineness as the ship's papers at Machias; and if that was done, there seemed to be no reasonable color for further detention. I must therefore pronounce this a case of damages.

In considering, however, the proper measure of damages, I am not aware that there ever has been allowed any vindictive compensation, unless where the misconduct has been very gross, and left destitute of all apology. It will be recollected on the present occasion, that the occurrence was soon after the commencement of the war, and that from long habits of peace, a good deal of indulgence ought to be allowed to the errors and misconceptions which grow out of a state of things so novel and embarrassing. Both captors and captured, at the breaking out of hostilities, labor under great misapprehensions as to their relative rights and duties, and if I were to exact rigid propriety from the one in all cases, I should be bound to apply it to the other. But short as has been the existence of the war, the experience of the courts of the United States has abundantly shown, that the general rules of practice must be applied in the first instance, with some laxity to claimants, as well as to captors, otherwise serious injuries might arise. We have found it necessary to yield to irregularities at the commencement, which would not be endured at a subsequent period, of the war. Nor am I stating principles at all peculiar to our tribunals. Whoever examines the proceedings

of foreign prize courts, will find what great indulgence is allowed to errors, and even improprieties of captors, where they do not appear to have acted with malignity and cruelty. Indeed it has been a subject of public complaint, that the practice has assumed such extraordinary latitude.

It seems that Capt. Downie received information of this as a suspected vessel, and if we credit the account given by his witnesses, her conduct was such as indicated an intention of going to and trading with the enemy. She was found at the extremity of the United States, and in the immediate neighborhood of the enemy's possessions. Two English frigates appear to have been at about five miles distance; and the same witnesses testify, that the schooner, as she was steering, would have probably fallen into their hands. Capt. Downie's suspicions were probably thus inflamed, and trifles light as air were, under these circumstances, strong confirmations of an unlawful or fraudulent destination. It cannot be disguised, for the records of this court show it, that illegal traffic with the British possessions in that quarter, has not been infrequent. I trust and hope, that there have been no citizens of the United States, who, since the war, would disgrace themselves and their country by an intercourse, which is dangerous to the public safety, and fraught with the most alarming penalties. There seems, however, in reality to have been no sufficient reason to suspect that such was the intention of the Lively. I most assuredly acquit her of any such illegality.

So far then as the taking possession of the schooner would have been a ground for damages, if she had been released at Machias, I should have thought, that it was too minute for public animadversion. But the bringing her to Salem, and instituting prize proceedings, was without justifiable cause. The damages then ought to be equal to the real injury sustained; and unless there have been personal indignities (which I shall by and by consider) the damages ought to go no further.

This leads me to consider the damages awarded in the report of the commissioners, and to which serious objections have been urged by the counsel for the captors. I entertain entire respect for the very intelligent gentlemen, who made that report; and although I shall have occasion to comment on the principles of that report, I shall do it without intending the slightest doubt of their good judgment. A preliminary objection has been taken to the report for the want of sufficient specification. And I think the objection well founded. It is the duty of the commissioners to make their report as specific as the nature of the thing will admit, so that not only the result, but the detail of their judgment may be before the court. All general statements and general sums, instead of items and apportionments, are discountenanced by the court. The manner of calculating the freight ought to have been given. Was it a calculation on the tonnage of the vessel? It ought then to have stated the tonnage and the allowance per ton. Was it estimated on the cargo? The freight per barrel, &c. ought to have been stated. The wages ought to have been specified in the same manner, and the number of the crew, the rate per day or per month. As to expenses, they ought also to have been specified, so as to enable the court to decide whether they were proper to be allowed or not. I will add too, that if profits be a fair item, they should have been presented in detail, with the proper deductions, so that if there were errors, they might lie open to the observation of the parties and of the court. In the present case it was peculiarly necessary, for it is almost incredible, that between ports of the same state, in any honest and fair trade, the enormous profit of upwards of sixty per cent. should have been made on a cargo of provisions, in a voyage of four days. A cargo too, which, with some few exceptions, is the common produce of every part of the state.

I confess that I was struck with the unusual amount which was assessed as damages,—an amount, which exceeds the whole value of the schooner and cargo as presented on the papers. The whole value is but $1167.-12, and the damages awarded are $1295.36. It has indeed been suggested, that the vessel was increased to a value equal to $500 after her purchase; but there is no evidence of the fact; and admitting it to be true, the extent of the damages is not materially affected by that consideration. If the whole vessel and cargo had been lost, it might have been proper to enter into a liberal allowance. But here they are restored, and there is not a tittle of evidence, to show that either of them sustained any injury in the hands of the captors. The voyage was not lost. There was no unlivery of the cargo, and the capacity of performing it still remained. Yet the sum given in damages seems to have proceeded upon the ground, that the voyage was lost, though it might have been performed at farthest in a week. These considerations have attracted my notice, and as the same principle, which governs this decision, must govern others of a similar nature, I have bestowed much reflection on the question of damages; I have also searched the authorities with some diligence, and in no case, that has fallen under my notice, have such extraordinary damages been allowed, where the property was not finally lost, or had not become incapable of subsequent transportation under the circumstances.

In cases where the vessel and cargo have been captured, and afterwards lost to the owner, the supreme court of the United States have confined themselves to the prime value thereof and interest thereon to the judgment; although in these cases they adjudged, that there was no probable cause of capture. Murray v. The Charming Betsey, 2 Cranch

[6 U. S.] 64; Maley v. Shattuck, 3 Cranch [7 U. S.] 458. And a rule substantially the same was adopted in a case marked with great impropriety,—Del Col. v. Arnold, 3 Dall. [3 U. S.] 333,—and in a case of gross illegality, and in which the courts were disposed to animadvert with considerable severity, they confined the damages to demurrage and interest on the principal of the captured property. Talbot v. Jansen, 3 Dall. [3 U. S.] 133.

In cases of a similar character, I should certainly feel myself bound to adhere to these decisions. Nor does the rule of foreign courts on restitution seem materially to vary. Where the property has been sold, and no account of sales has been rendered, the value is estimated at the prime cost and ten per cent. profit; where an account of sales is rendered, that in general is made the measure of the decree. The Lucy, 3 C. Rob. Adm. 208; The Narcissus, 4 C. Rob. Adm. 20. I do not mean to suggest, that other rules may not be occasionally resorted to in flagrant cases, but in the opinions intimated by the court, there is not a more liberal usage alluded to. The first object is to repair the actual damage and loss, and the next to punish aggravated misconduct. Although the argument did not object to the nature of the items, but chiefly to the undue measure allowed, I feel myself obliged, upon general principles, to declare my disapprobation of some of them. And first, as to the freight; there can be no doubt that freight is a proper item of allowance, where the voyage has been lost, or the cargo been unlivered. But upon what ground can the owner in this case claim it? His vessel has been restored with the cargo on board, and in a situation capable of performing the voyage. If it be not performed, it is his own fault or choice; but in neither case could he have a right to complain of a loss, which he could avoid sustaining. Suppose this vessel had been bound to an European port, had been captured, carried into a neutral port, and there released by consent, would it be contended, that the master might, without necessity, return home and throw the loss of freight upon the captors? Suppose a voyage from Europe to New York, and the vessel be captured and sent into Boston, and, after proceedings there, restored, will it be pretended that he might abandon the voyage without good cause, and charge the freight to the captors? Unless he could, I do not think that he could in the present case. Indeed, this is a still stronger case, for the voyage is between ports of the same state, and it might be completed in four days. Nor can it be said, that the allowance of freight is on account of the detention, for that is considered in another item, that of demurrage.

Another item, that "for seamen's wages and Mooney's time," might be proper under circumstances, but it may be included in the demurrage, which is a compensation in lieu of freight, and usually covers the expenditures of the ship. And if the wages of the seamen during the voyage, and not during the detention, were intended (as I presume they were) in this item, it is inadmissible on the same ground as the freight.

The expenses of Mr. Mooney are next allowed; but as these expenses are not specified, I know not what they are. They may or may not be correct in principle; but having been objected to, I shall not allow them without a specification.

But the most important item, that of loss of profits, deserves a more exact consideration. I should have been glad to have seen an authority approving of such an allowance under circumstances like the present. How have these profits been lost? The voyage was not broken up, nor incapable of being pursued. I am not aware of a single authority in the higher courts of admiralty, in which supposed profits have formed an item of damage in cases of restitution. In Maley v. Shattuck, 3 Cranch [7 U. S.] 458, it appears that an allowance for loss of profits was refused, and the refusal was a subject of complaint by the owner. In Talbot v. Jansen, 3 Dall. [3 U. S.] 133, it was not allowed. In Le Caux v. Eden. 2 Doug. 594, 596, there is a report of commissioners, which among other items includes one "for loss of part, and damage done to the rest of the cargo, and the diminution in the produce by the loss of the market." Whether this report was accepted or not, and if accepted, what was the amount allowed, is not stated. Nor are the facts so stated that any conclusion as to the principles, on which the report was framed, can be ascertained. It might be, that the usual allowance of ten per cent. for profit, as in cases of pre-emption and sales abroad, was awarded. I have not been able to trace in later reports a single instance, where loss of profits has been allowed. In The Corier Maratime. 1 C. Rob. Adm. 287, the circumstances of which approached near to the present, the captors, after bringing the vessel into port, did not proceed to adjudication, and a monition at the instance of the claimants issued to compel proceedings, and the captors afterwards consented to restitution. The court allowed demurrage for the time of detention, and nothing more. In the Zee Star. 4 C. Rob. Adm. 71, and the St. Juan Baptista. 5 C. Rob. Adm. 33. under circumstances unfavorable to the captors, a similar rule was adopted. I do not undertake to say, that these cases are not distinguishable from the present; I cite them only to show, that the mere absence of justifiable cause of capture, or the improper conduct of captors, is not usually followed by compensation for supposed loss of profits, when the voyage is not lost.

Independent however of all authority, I am satisfied upon principle, that an allowance of damages upon the basis of a calculation of profits is inadmissible. The rule would be in the highest degree unfavorable to the interests of the community. The sub-

ject would be involved in utter uncertainty. The calculation would proceed upon contingencies, and would require a knowledge of foreign markets, to an exactness in point of time and value, which would sometimes present embarrassing obstacles. Much would depend upon the length of the voyage, and the season of arrival, much upon the vigilance and activity of the master, and much upon the momentary demand. After all, it would be a calculation upon conjecture, and not upon facts. Such a rule, therefore, has been rejected by courts of law in ordinary cases, and instead of deciding upon the gains or losses of parties in particular cases, an uniform interest has been applied, as the measure of damages for the detention of property. The rule is also subject to this further objection, that it is inapplicable to a great class of cases, or if applied, would work a manifest wrong. If a vessel were bound to a bad market, and were captured without justifiable cause, would it be endured, that the captors should shelter themselves from responsibility, by alleging that the owner sustained no loss, because his property was saved from a ruinous market? I cannot believe that such a pretence would be allowed. It would encourage the most injurious speculations on the chances of a condemnation. It may be said, that as to a wrongdoer, every thing is to be presumed against, and nothing for him. But I cannot admit, that a rule in a court of justice ought to be adopted, which would always work one way; and if deliberate wrongs be done, which call for redress, this court can apply a direct compensation without resorting to such an uncertain measure. Besides, it will be recollected, that it is not the wrong-doer alone who becomes responsible. The innocent owner, who has done no wrong, who has confided in the good conduct of his master, must often and indeed usually be the party, upon whom the whole severity of the loss will fall. It would be peculiarly unjust to involve him in the effect of irregularities, in which he took no part, by a regulation, from which he could, under no circumstances, derive a benefit. It would also operate a discouragement upon the public service. So long as public ships or private ships are armed with the warlike commissions of the government, it is the duty of courts of justice to grant due indulgence to the nature of the service, and not to punish every irregularity with penalties amounting to a prohibition of captures. The argument against the adoption of the rule, founded upon the public inconvenience, cannot be forgotten by this court, or any other court looking solely to its duty. With the policy or impolicy of the war we have nothing to do; and while we guard the citizen from unjustifiable seizures, we ought not to overlook the consideration, that officers are often called to decide under great embarrassments, and that their habits of life will not always guard them from mistakes of legal rights. Public ships, as well as private ships, must be governed by the same principles; and if an erroneous capture were to be followed by a compensation of all the possible profits of the voyage, no person in the service could be safe. This leads me to another objection against the rule; that it confounds all degrees of irregularity, and punishes innocent misapprehension with all the effects of wanton outrage. If the rule is to apply, it must be general. The damage sustained by the owner, as to loss of profits, will be the same, whether the capture be through mere mistake or obstinate malice; and to attempt a discrimination as to the cases will be often illusory, and sometimes injurious.

Upon the whole I am well satisfied, that the profits, upon the supposition of a prosperous termination of the voyage, ought not in any case to constitute an item of damage. In case of a total loss, the invoice price and interest, as adopted by the supreme court, is a fair and reasonable compensation. In cases of sales, if the amount be less than the invoice price, the same rule may prevail; if more, then perhaps the increased price, under circumstances, ought to be for the owner's benefit. The Lucy, 3 C. Rob. Adm. 208; The Narcissus, 4 C. Rob. Adm. 20. If no account of sales can be obtained, then perhaps the 10 per cent. upon the invoice, as in cases of pre-emption, is a fair addition. But where the property is restored uninjured, and in a situation not to lose the voyage, indemnity for the delay is obtained by demurrage for the vessel, and interest upon the invoice value of the cargo. Cases may arise, which may require a different regulation; and without pretending to anticipate them, I shall endeavor to guide myself by general principles, which may save the embarrassment of nice distinctions, and circumscribe the bounds of discretion. After these remarks, it is hardly necessary to say, that I shall not adopt the report of the commissioners. If circumstances would permit, I should probably send back the report to the same or to other commissioners; but as the cause is not of great magnitude, and a delay, with perhaps new objections to a new report, would be inconvenient to all parties, I shall proceed to pronounce upon the cause without further investigation. I shall allow demurrage, including therein wages and expenses of the ship from the time of capture until she could return to the place of capture. As the value of the cargo is small, and the interest on it will not be great, I shall allow 10 per cent. interest during the same time. As the owners must have been put to some expenses, I shall allow a sum for that charge.

The account then will stand thus:

To William Mooney, as Ship Owner.

| | |
|---|---:|
| Demurrage 38 days, at $5 per day.... | 190 00 |
| Articles taken from the vessel........ | 76 86 |
| | $266 86 |

To William Mooney and Albigence Hayward, Owners of the Cargo.

Interest on invoice price of cargo $1052
　at 10 per cent. for 38 days......... 10 95
Expenses and charges.............. 50 00
Fees of commissioners............. 76 08
　　　　　　　　　　　　　　　　　　———
　　　　　　　　　　　　　　　　　$137 03

But now it is for the first time suggested, that actual damage was sustained by the cargo, and certainly, late as it comes in the cause, as it is confirmed by the declarations of the commissioners, I shall suspend a final decree, until I have heard the evidence, which may be adduced by the parties.

Having thus disposed of this part of the cause, I now proceed to consider the allowances made by the district court for personal indignity and abuse to the captured. There can be no doubt of the jurisdiction of this court to punish every indignity offered to those, who, by the fortunes of war, fall into the possession of our armed ships. It would be disgraceful to the character of the country to suffer a practice to exist, which, setting at defiance the rules of civilized warfare, should consummate a triumph over an enemy by personal indignities, or modes of restraint unnecessary for the general safety. Much less ought such conduct to be tolerated towards neutrals or citizens of our own country. And where the case should be clearly made out, accompanied with undeserved suffering or malicious injury, the court could never hesitate to pronounce for exemplary damages. In the present case the injury is alleged to have been done to Mr. Mooney; and, short as was its duration, if it had stood merely upon the evidence produced in the district court, I should not have hesitated to affirm its decree. But new evidence has been adduced, and, upon a careful examination, I am not satisfied, that both parties were not equally to blame. The whole testimony on the part of Mr. Mooney comes from Capt. Cole, who has discovered no inconsiderable zeal, and obviously testifies under a very strong bias. I am sorry to add, that he does not seem willing to state the whole facts, which attended the transactions, and that it is only upon cross interrogatories, that a reluctant confession is drawn from him, that warm words passed between Capt. Downie and Mr. Mooney at the time of hand-cuffing. I observe also, that though he states at large the challenge of Capt. Downie, he drops altogether any account of the provocation that led to it. If witnesses expect to receive credit in courts of justice, they must be ready to declare the whole truth. Partial, inflamed statements are entitled to little weight; and if material circumstances are omitted, it is no harshness to allow less credit to what is declared. Mr. Cole's testimony is encountered by two witnesses on the part of the captors. They relate facts, which he has omitted, and contradict him in several particulars. They show very improper conduct on the part of Mr. Mooney; and

provocations, which change the coloring given to the cause. It cannot be expected by persons, who are captured, whether illegally or legally, that they are permitted to act as they please; that they have the right to use intemperate language, and provoke insult, and then are to receive a compensation. When a vessel is captured as prize, the papers belong exclusively to the captors; and the other party is bound to submit, and await a regular adjudication in the tribunals of his country. If he suffer wrong, he will there receive his redress by adequate damages; and it never can be the interest of captors to trample upon his rights. They will be taught to respect them by the power of the law. Now, if I believe the evidence on the part of the captors, Mr. Mooney was greatly to blame, and deserves no personal remuneration. But admitting that the case stands in doubt, it is a sufficient ground to deny damages. I am strongly impressed with the belief, that Mr. Mooney, claiming as an American citizen, did not willingly submit his vessel to be captured as a prize, and that a mutual recrimination produced the improper conduct, which has been alleged. Both parties were in blame; and I shall therefore leave them without any recompense. As to the allowance of fifty dollars to Mr. Hayward, I do not find, by any testimony in the case, that he was on board the vessel at any time during the voyage. He could not therefore be a personal sufferer, and of course is not entitled to any damages. I presume the allowance in the district court was founded upon some misapprehension of the counsel as to that fact.

This cause afterwards came on to be heard a second time upon additional evidence, as to the deterioration of the cargo. The respective counsel submitted their arguments in writing, which were as follows:

Mr. Pitman, for respondents.

(1) The commissioners exceeded their authority in ordering a sale without the consent and knowledge of the captors. (2) The sale was made without due notice to "all concerned;" if the captors were considered as concerned, they had no opportunity to attend the sale; the notice was published in the morning, the sale took place at 12 o'clock. (3) The father of the claimant, A. Hayward, should not have been the auctioneer. (4) The advertisement stated untruly that all the cargo was "partially damaged;" the auctioneer, in his affidavit, states only that the flour, corn, meal, and bread were partially damaged; the advertisement was therefore calculated in its nature to keep back purchasers and injure the sale. (5) When the respondents took their vessel and cargo agreeably to the order for restoration, the vessel and cargo were out of the custody of the law, and not subject to the order of the commissioners deriving their authority

from the court. (6) If the captors were interested in the cargo as pretended, they should have been apprised of the same, that they might have kept somebody on board to attend to their interest, and to have seen the vessel properly navigated from Salem to Boston. (7) It does not appear why the cargo was carried to Boston for the purpose of selling the same, or that the captors consented to the same, and why the cargo was not sold in Salem where the captors lived, and who had the greatest interest in the sale, if they were to make good all deficiencies in price from the invoice. (8) The commissioners had no right to require that the cargo should be carried to Boston for sale. (9) No account of sales is rendered by the auctioneer, so that it is impossible to compare the sales with the invoice, and thereby to determine what articles might have been affected by the market, and what by deterioration. (10) It does not appear that the cargo of the Lively sustained any damage after the capture, there being no evidence to show but that the cargo was in as good a state when it was delivered to the claimant in Salem as when it was captured; the nature of the damage sustained by the cargo is not stated; the captors had no right to break bulk to examine the cargo at the time of capture. (11) The conclusion, arising from a sale of articles at auction differing in price from the purchase at private sale (that is, the invoice in this case), is not by the logic of a merchant or a lawyer, that the articles thus sold are deteriorated in quality because they are so in price, and such a sale ought to include nobody but those, who are consenting and are privy to it, or unless it has been effected by the due course of law. It is conceived that the affidavits of the commissioners cannot now be brought in to explain their report in other respects, particularly after they were called upon in the district court for a specification of the principles upon which they made it, which they then offered, but which was not specific, and from which we appealed.

Mr. Jackson, in reply.

The commissioners did not order a sale. They examined the cargo so far as either party desired, and found it damaged; but instead of conjecturing what was the amount of damage, they suggested the method of selling at auction in Boston, to ascertain the amount, and proposed to postpone their report, and be governed in this particular by the result of such sale. Neither party objecting, it was so sold, and their report made accordingly. (For this I refer to the affidavits of Messrs. Codman and Chapman.) The sale was advertised on the day before, as well as on the day of the sale. (Mr. Hayward's affidavit.) If the cargo was thought to be somewhat damaged, it might attract purchasers, from the expectation of buying cheap; and Mr. Hayward, being father of one

of the claimants, would (if influenced at all) be induced to get the highest price possible; as he could not then know whether the claimants would ever receive any thing more than the proceeds of that sale. And from Mr. Chapman's and Hayward's affidavits, there was a large number of respectable people at the sale, which was conducted fairly. The vessel was safely navigated from Salem to Boston at the expense of the claimants. One of the commissioners was present at the sale, and they were all satisfied with the account of sales at the time, when the transaction was recent, and any error easily detected; and they, as well as the auctioneer, state the difference between the actual proceeds, and the price of such articles if sound. The vessel had been out of port three days when captured, and was detained about five weeks in the worst season of the year, before the sale. I refer to the former examination of the cause in court, and to the affidavits of Codman, Chapman, and Hayward, for any further answers that may be necessary to Mr. Pitman's argument hereto annexed.

STORY, Circuit Justice. The cause has now been again argued upon the supplementary affidavits, as to the question of damages on account of injuries sustained by the cargo. This second examination has abundantly satisfied me of the danger of allowing any irregularity in prize proceedings, and of the importance of an accurate knowledge on the part of commissioners of the boundaries of their duty. No inconsiderable embarrassment has been thrown upon the court by the want of exactness in these particulars. In cases of restitution with damages in prize proceedings, if in order to ascertain the damages an inspection or a sale of the cargo be, in the judgment of the commissioners or the parties, necessary for the furtherance of justice, application should be made to the court for an order of unlivery and appraisement, or for a sale, as the case may require. Where an unlivery and appraisement is sought, it is the usual practice for each party to name one, and the court to appoint the third commissioner. Notice of the execution of such commission should be given to both parties, that they may attend, if they see cause, and the commissioners should not allow any evidence to be given behind the back of either party, which they have not an opportunity to repel. If on the other hand a sale be advised, it should be made by the proper officers, acting under the eyes, and at the instance of the court. In this way the parties will have an opportunity to attend the sale, and the time and place may be directed by the court, as public convenience may require. Under such proceedings no surprise or undue advantage can take place. If the appraisement be too low in the judgment of either party, the right to elect a purchase on the part of the captors, and to elect a sale on the part of the cap-

tured, may under circumstances be allowed, as in cases where the voyage is completely broken up and abandoned; and at all events the decisions and proceedings of the commissioners are subject to all legal objections, when they pass in review before the court. The property or its proceeds still remain in the custody of the prize court, and may be disposed of as law and justice shall require. The report of the commissioners may, if necessary, be rejected or remoulded, and a legal decision obtained in all difficulties. But if a decree of restitution be passed, and actually executed before an appraisement or sale is had, the property is no longer within the control of the court, and in many instances it will be impracticable to administer complete relief.

The present case is not exempted from these difficulties. No legal appraisement was had. A partial survey and unlivery was made, and after the property was restored, it was conveyed to Boston, and under the recommendation of the commissioners, without any application to the court or direct assent of the parties, was sold at public auction; and this sale was the basis, on which the commissioners proceeded to estimate the damages. The commissioners also heard ex parte evidence without notice to the other party, and by such means ascertained the profits of the intended voyage. There can be no doubt, that the commissioners acted with good faith, but under a total misapprehension of their duty; and independent of every other consideration, these circumstances would have been sufficient to induce me to open the report, if I had not already upon other grounds laid it aside.

It appears from the affidavit of the auctioneer, (who is the father of one of the claimants) that the nett sales amounted to $724, and that in his opinion, the damage to the goods was at least 25 per cent. One of the commissioners also states, that he attended the sale, and it was conducted with perfect fairness. I do not doubt the fact. But the captors have required, and have not received any account of the sales; and the nature of their testimony in defence required that it should have been produced. Without meaning to make any suggestion against the auctioneer, I cannot but think the remark justifiable, that he was not an indifferent person, and ought not to have superintended the sale. But a more important objection is taken to it by the captors, supported by affidavit, that they never assented to the sale, or had notice of it, or acquiesced in its propriety. They contend also, that if it had been proper, Salem and not Boston should have been the place. I am satisfied, that the captors are not bound by the sale, under the circumstance of a want of assent and notice. And although

it is still evidence to be submitted to the court, it cannot avail even as a strong presumption of the real value, especially as no account of sales is produced. The presumption (such as it is) arising from the sale is encountered by strong affidavits of the captors, that the deterioration and injury of the goods was slight and inconsiderable, and that though two thirds of the cargo was taken out, but a small portion was found in an unsound state.

It is very difficult and perhaps impracticable to reconcile the whole testimony in the cause, and I am not prepared to say, that the weight on either side so far preponderates, as to entitle it to unquestionable credit. The auctioneer declares the estimated injury at least 25 per cent. The captors make it quite inconsiderable. I am not sure therefore, that in any event the evidence enables me to do complete justice to the parties. If however I err in this respect, it is some consolation that the error is involuntary, and has resulted from irregularities, over which I have had no control. On the whole I shall steer a middle course, and allow for the deterioration of the cargo 20 per cent. on the invoice value. The supplementary evidence on this second hearing has completely satisfied my mind that the voyage might have been pursued, and was abandoned without necessity. I retain therefore the opinion, which was expressed at the former hearing, on the other parts of the cause. As no appeal was interposed respecting the item of $76, which was rejected by the district court, and I am entirely satisfied with that decision, I shall lay the item out of the case. The account then, as finally rectified, gives to William Mooney, as ship owner, $266.86, and to William Mooney and Albigence Hayward, as owners of the cargo (including the damages at 20 per cent. on the invoice value) $352.43, amounting in the whole to $619.29.

I affirm the decree of the district court, as to the restitution of the schooner and cargo, and reverse it as to the damages allowed by that court; and I do award that the claimants recover their damages against the captors for the illegal capture, viz. Mr. William Mooney, as ship owner, the sum of $266.86, and William Mooney and Albigence Hayward, as owners of the cargo, the sum of $352.43, with costs. I observe that the claim for the cargo has been given in by Mooney in behalf of himself and Hayward, though both are inhabitants of Boston. This is irregular. Where the parties are within the jurisdiction, they should claim in person. When they are in a foreign country, a claim by an agent is admissible. In all cases where it is practicable, the captors have a right to the personal answer on the oath of the respective claimants.