No. 13,985.

# W. W. ARMISTEAD VS. SHREVEPORT AND RED RIVER VALLEY RAILWAY COMPANY.

## SYLLABUS.

1. A railroad company constructing a bridge across a navigable stream so negligently as to obstruct the navigation of the stream, is responsible for the damages caused by the obstruction.

2. A litigant who has himself violated a compromise is not in a position to plead such compromise in bar of his adversary's action.

3. It is the duty of a party to protect himself from the injurious consequences of the wrongful act of another if he can do so by ordinary effort and care, or at a moderate expense; for which effort and expense he may charge the wrongdoer; and where, by the use of such means he may prevent loss, he can only recover for such loss as could not thus be prevented.

4. The duty of preventing, or minimizing, a loss about to occur rests primarily on the party by whose negligence or fault it is about to occur, and if such party voluntarily fails in this duty, having means ready to hand for the performance of it, he alone will be held responsible; and it will not avail him to say that the injured party might have lessened the damages by performing the duty for him.

5. The plaintiff chartered a boat to convey some cotton seed to his cotton seed oil mill. The defendant's bridge obstructed the passage of the boat and deprived plaintiff of the profits he expected to realize from the milling of the seed. *Held,* plaintiff can recover for these profits.

6. On the same voyage plaintiff expected to realize profits from the selling of liquors and fruit; also he expected to procure other cotton seed and to realize a profit from the milling of the same; all these profits are too uncertain and contingent to serve as a basis for a judgment.

### ON REHEARING.

1. The authorities agree that after a wrong has been committed, the damaged party shall not increase it, and that, if he does, he shall have no right to complain of loss or injury sustained by his willful acts of omission or commission. Beer vs. Board of Health, 35 Ann. 1132.

2. In this case, a carrier having failed to take certain cotton seed, and to carry it from one point to another, according to a contract, and the other contracting party, being in possession of the seed at the place of intended shipment, having abandoned it, so that it was lost, or destroyed, it is held that the measure of damages for which the carrier is liable is the value of the seed, at the place of intended delivery, after deducting its value at the place of intended shipment and the freight, as agreed on, and adding to the remainder the expense which would have been incurred in preserving the seed. The carrier is not, however, liable for the loss resulting from the abandonment of the seed, nor for the prospective profits to arise from its conversion into manufactured products, at the point of delivery.

Armistcad vs. Railway Company.

A PPEAL from the First Judicial District, Parish of Caddo—
*Land, J.*

*Sutherlin & Hall and Nettles & Carter,* for Plaintiff, Appellant.

*Leonard, Randolph & Rendall,* for Defendant, Appellee

The opinion of the court was delivered by PROVOSTY, J.

On Rehearing by MONROE, J.

The opinion of the court was delivered by

PROVOSTY, J.   The plaintiff, owner of a small cotton seed oil mill,. chartered a steamboat for the purpose of transporting to his mill a lot of cotton seed he had accumulated on the bank of Lake Bisteneau; also for the purpose of transporting from his mill to certain customers of his mill some cotton seed meal, the product of his mill; and,. incidentally, for the purpose of carrying some freight for the public. Also he thought to turn an honest penny on the trip by having on the boat some fruit and liquors for sale. For the privilege of selling these liquors and fruit he paid an internal revenue license of $9.50.

The bridge of defendant across Loggy Bayou barred the passage of the boat, and put an end to the voyage, to plaintiff's alleged damages, as follows:

120 tons of cotton seed at $7.00 per ton.....................$840 00
2000 seed sacks at 10 cents ..............................  200 00
Fruits and liquors .....;.................................. 125 00
Revenue license .........................................    9 50
Loss of profits on same .................................   200 00
Miscellaneous freight ...................................   100 00
Inconvenience and trouble .....................................   100 00
Net profits on the manufacture of the seed ...............   428 00
Damages by failure to get other seed.....................   500 00
Loss of profits on 100 tons of meal.......................   225 00
Loss of profits on hulls .................................   47 75

The defendant does not seriously deny its responsibility; but pleads a compromise; and strenuously contests the amount of the damages.

The compromise stipulated the payment of a certain sum to plaintiff in full of all claims; and stipulated, further, as follows: "The party of the second part * * * hereby bind and obligate themselves to have a steamboat at the landing of said Armistead" (the plaintiff) "at Cabin Point on Red River on or before March 27th, 1899, to receive a cargo or such part thereof as said Armistead may desire to transport, and to transport the same on said boat up Loggy Bayou and through Lake Bisteneau as high up as Fort Bolivar *in the event a sufficient depth of water can be found on said route to permit the passage of said boat."*

The clause italicized here is italicized also in the instrument of compromise. It was inserted in view of the fact that the water in Loggy Bayou and Lake Bisteneau might at any time fall below the navigation stage. In the event of such fall plaintiff would have to take defendant's will to make the trip in place of the deed of having made it. Under these circumstances, plaintiff was justified in treating a two days delay in the tendering of the boat as having vacated the compromise. There is also evidence to the effect that this and the previous delay had caused the orders for the cotton seed meal to be countermanded. Time, here, was the essence of the contract. Davidson vs. Von Lingan, 113 U. S. 40.

Moreover, plaintiff was under no obligation to furnish a cargo, and, therefore, his refusal to deliver his meal for transportation did not excuse the boat from proceeding on its voyage in fulfillment of the compromise. The boat was "to receive a cargo or such part thereof as the said Armistead may desire to transport." If Armistead desired to transport no cargo, all the boat had to do was to proceed on its voyage to transport the seed.

The defendant violated the compromise, and then voluntarily cancelled it; and is, therefore, not in a position to plead it in bar of plaintiff's action.

We proceed to take up the items of damage in regular order.

The seed was left to rot and to be appropriated by who might choose to take them. The responsibility for this, the plaintiff and the defendant cast each upon the other. The evidence shows that there was reasonable certainty of the navigation holding out for one trip of the boat, and we think defendant should have made this trip. It is idle to say that plaintiff might have saved the seed by means of sheds,

fences, or land transportation, or what not.   The business way of going at saving the seed was to go and get them in a boat; and after barring plaintiff from doing this defendant should itself have done it, since this boat was to hand for the purpose.  Sutherland on Damages,. Vol. 1, pp. 150, 151; 2nd Ed., p. 187, Sec. 88.   The boat could have carried and saved 86 to 90 tons, worth $7.00 per ton.   Defendant is responsible for this; less $1.80 per ton, which plaintiff might have realized on the seed by transporting them by land to Shreveport. For the remainder of the seed we do not hold the defendant responsible, as it does not appear that the boat could have counted, with reasonable certainty, on having navigation for a second trip. As to this remainder of the seed we hold plaintiff to the obligation under which he was to use every reasonable endeavor to save the seed, with the right to charge defendant with the expense of the salvage.   So holding him,. we can allow no more than the probable expense of the salvage. Adopting, for want of a better, the lower court's estimate of this expense, we fix this salvage at 50 cents per ton, or $7.00 in all.

We can allow nothing for the sacks; they could have been saved at an insignificant expense, and plaintiff was clearly under the obliga- tion thus to save them, and they are probably included in the estimated value of the seed.

As to the "fruits and liquors" and "inconvenience and trouble," we adopt the estimate of the judge *a quo* and fix the damage at $100.00.

By the act of the defendant the plaintiff was deprived of an oppor- tunity to utilize his revenue license, which had cost $9.50.  We think. this amount should be allowed.

We disallow the item "loss of profits on same $200."   These profits- are not proved with sufficient certainty.

For the same reason, we disallow the item "miscellaneous freight $100," and the item "damages by failure to get other seed $500."

We do not agree with the learned district judge in his denial to plaintiff of the profits expected to be made on the milling of the seed. The defendant cannot deny that but for the obstructing bridge plaintiff would have had the milling of the seed and that this operation would have yielded profit.   The seed had been procured for the purpose of realizing this profit; and this profit thus cut off by his wrong, defend- ant must make good.   Sutherland on Damages, 2nd Ed., p. 132, Sec. 59; p. 157, Note 1, Sec. 70.   We fix this profit at $2.75 per ton, or $275.00.

We adopt the estimate of the judge *a quo* on the two last items,. "loss of profits on 100 tons of meal $75.00," and "loss of profits on. hulls $6.00."

### RECAPITULATION.

| | |
|---|---:|
| 86 tons of seed at $5.20 | $447 20 |
| Salvage of 14 tons of seed at 50 cents | 7 00 |
| Fruit and liquors, inconvenience and trouble | 100 00 |
| Revenue license | 9 50· |
| Profit on manufacture of seed | 275 00 |
| Loss on cotton seed meal | 75 00 |
| Loss on hulls | 6 00· |
| | $919 70 |

It is therefore ordered, adjudged and decreed, that the judgment appealed from be increased to the amount of $919.70, and that as thus· amended it be affirmed with costs in both courts.

### ON REHEARING.

MONROE, J. It is suggested in the application for rehearing that· there is error in the opinion handed down in the matter of the amount· allowed for seed, and for profit on the manufacture of seed, and a re-examination and reconsideration of the evidence and of the law of the case has led us to conclude that the suggestion is well founded. The· defendant was at fault in obstructing Loggy bayou with its bridge, but the fault was entirely without malicious intent and at once ac-knowledged, and the most earnest and honest efforts were made to· repair it  The captain of the boat which the plaintiff had chartered was paid $100, an amount fixed by himself, to compensate him for the· use of his boat, and the defendant agreed to furnish the plaintiff with another boat, on or before March 27th, that would go through the· bridge.  In order to comply with this agreement it chartered the "Lil-lie Barlow," at $25 a day, and wired to Vicksburg for a pilot, to whom it agreed to pay $4.00 a day, and boat and pilot were at hand before the time appointed.  But, unfortunately, one of the boat's cylinder heads· was blown out, a Sunday intervened, which delayed the repairs, and the boat was not ready to start until the morning of March 29th.  We· have held, in the original opinion, that the plaintiff was within his legal rights in declining to accept it at that time.  It is, nevertheless, a

fact that he might have accepted it with but little inconvenience, or loss, and that his refusal to furnish the meal for the outgoing cargo, or to accept the offer that was made to him, through the attorney who had represented, and who assumed to be, then, representing him, to pay $150 and to bring out his cotton seed from Lake Bisteneau, was an extreme, and, as we think, rather inequitable, assertion of those rights. The defendant, through its representative, was told that it could bring out the seed, but that the plaintiff's claim could not be settled unless it also paid $400, and, this demand being considered unreasonable, the plaintiff paid the boat and the pilot which it had employed something over $100, and discharged them, with the expectation that it would be called on to answer in an action in damages.   Such an action was brought at once in the parish of Red River, the plaintiff claiming, then, as he claims now, $2650, and including in his claim the alleged value of the cotton seed, then lying on the shore of Lake Bisteneau within three miles of his plantation and of the store conducted by his son and son-in-law with capital furnished by him, which seed he assumed to abandon as in a case of total loss; and, the action thus brought having been dismissed, he brought the present suit in the parish of Caddo. We think that the plaintiff's demand was unreasonable, and that, whilst it was perhaps the duty of the defendant, having the boat at hand, to have brought out the seed, yet, that its failure to do so gave to the plaintiff no right to abandon the seed as in case of total loss.   The evidence shows that it was rather late to have made it available as a fertilizer during the planting season of 1899 and that it could not profitably have been shipped elsewhere for milling purposes, but it also shows that it could have been protected where it was at a cost not exceeding $50, or stored in a vacant house, not more than a half mile distant, and that it could have been preserved and would have been quite as valuable if not more valuable the next season.   The plaintiff however, having adopted the theory of abandonment, persisted in it to the end, and not only did neither he nor his representatives, who were on the spot, pay any attention to the seed, of which they were in possession, but they seem to have allowed it to be understood that it belonged to nobody, and plaintiff's son testifies that he actually saw the wagons of his neighbors going to haul it away without making any comment or obejction.   The names of some of those neighbors are given, and, in view of the testimony referred to and of the fact that it is not suggested that they were

dishonest people, we think the presumption a fair one that the plaintiff, or his representatives, practically, gave the seed away, which they certainly had no right to do at the expense of the defendant. Beyond this, there is considerable conflict in the testimony as to the quantity of seed.

Plaintiff's son testifies that he weighed four or five of the sacks and that their average weight was 140 pounds; and there is further testimony, in support of this statement, as to the manner in which the sacks were filled, showing that they were suspended and the seed rammed in with pestles; and we must accept this evidence as conclusive upon the question of weight, though disinterested witnesses, engaged in the business of handling seed, testify that the average weight of seed, in commerce, is 100 pounds to the sack. The more serious conflict is as to the number of sacks. The same witness for plaintiff states that he counted them when they were hauled to the landing and that there were 1500 sacks, whilst two witnesses for the defendant, who were sent to Port Bolivar for the purpose, immediately after the refusal of the plaintiff to accept the "Lillie Barlow," testify that they counted them and found only 750 sacks, and one of these witnesses further testifies that about that time, he met the witness for the plaintiff, above referred to, and that the latter told him that there were about 800 sacks at Port Bolivar, and from 150 to 200 at Vicker's Landing. This statement is, however, denied by the witness to whom it is attributed. Upon the other hand, a witness who lives in the neighborhood, and who, it appears had ordered a half ton of meal from the plaintiff, being examined under commission, as a witness for the plaintiff, is asked, "Do you know of any seed accumulated in March or thereafter, 1898" (1899), "on the bank of Lake Bisteneau; if so, how much seed was there and what became of those cotton seed?" to which he replies: "I do, I do not know how much, but suppose that there were somewhere between five hundred and a thousand sacks"; and he further testifies that the seed was hauled away by persons whom he names, being the neighbors to whom we have already referred. The plaintiff claims, and so testifies, that the seed was worth $7.00 a ton, on Lake Bisteneau, and $9.00 at his mill, at Cabin Point, and that the freight by the boat was to have been $1.25 a ton. Other witnesses, doing a much larger milling business, at Shreveport, testify that they bought seed at $5.50 and $6.00 a ton f. o. b. throughout the country, but would not have bought it at all on Lake Bisteneau, because of the difficulty of getting

it out and that it was worth about $8.00 at their mills. The plaintiff claims that his sacks were worth ten cents each; the witnesses mentioned testify that seed sacks were worth about half that amount. The plaintiff, who had had about one year's experience in milling, whose mill was operated for eleven and one-half hours during the day, working up a ton of seed an hour, and was shut down at night, testifies that his profits from the manufacture of seed amounted to $4.00 a ton, though the seed itself was worth $9.00. Another witness, who has been in the business for many years, who manages a mill that runs day and night and consumes about fourteen times as much seed in twenty-four hours as that of the plaintiff, and who gets his seed at seventy-five cents less a ton than the seed in question would have cost the plaintiff according to his own statements, testifies that the profits in the milling amount to about $1.50 a ton, that there is great advantage and economy in running a mill continuously, and that, for that reason, the practice is universal, in all large mills.

To these facts, we are of opinion that the legal principles which should be applied are those which have been recognized by the courts and text-writers, as follows, to-wit:

"The authorities agree that after a wrong has been committed, the damaged party shall not increase it, and that if he does, he shall have no right to complain of loss or injury sustained by his willful acts of commission or omission." Beer vs. Board of Health *et als.*, 35 Ann. 1132; Judice vs. Southern Pacific Co., 47 Ann. 255; Airey vs. Pullman Palace Car Co., 50 Ann. 653; Bader vs. Southern Pacific Co., 52 Ann. 1060; Carr vs. Canal Co., 105 La. 239.

"Where a party is entitled to the benefit of a contract and can save himself from a loss arising from a breach of it, it is his duty to do it, and he can charge the delinquent with such damages only as with reasonable endeavors and expense he could not prevent." Warren vs. Stoddart, 105 U. S. 224.

"The duty is not arbitrarily imposed upon the injured party to do or amend the work of the other, or to finish it, but only when it is a reasonable duty that he ought to do, instead of passively allowing a greater damage." Sutherland on Damages, Vol. 1, pp. 150, 151.

And, so applying them, we conclude that, in allowing seventy-five cents per ton, on a hundred tons of seed, as the difference between the value at Lake Bisteneau and at Cabin Point, after deducting cost of transportation, and adding thereto $50 as the probable cost of pre-

serving the seed at Lake Bisteneau, the judge *a quo* has given the plaintiff all that he is entitled to upon that item of his claim.

As to the claim for loss of profits which might have been made upon the manufacture of the seed, the defendant is not liable therefor in any aspect of the case, since, in the first place, there was nothing, so far as we are informed, to have prevented the plaintiff from buying and manufacturing other seed, nor does it appear that he did not run his mill to its full capacity during the entire season, and, in the next place, unless there are unusual conditions, which are not established in this case, the limit of a carrier's liability for the non-delivery of goods is: the value of the goods at the place of destination, at the time at which they should have been delivered, and this the plaintiff has been allowed, less the loss occasioned by his failure to take care of the goods in question at the place from which they were to have been shipped. The computation contained in the opinion handed down should, therefore, be amended by reducing the item of $447.20 relating to the value of the seed, to $75, by adding $50 at the probable cost of preserving the seed, and by striking out the item "Profit on the manufacture of seed, $275," which would reduce the judgment as rendered by us to $322.50.

It is therefore ordered and adjudged, that the decree heretofore rendered be amended by reducing the amount thereof to $322.50, and, as thus amended, that it be, now made, the final judgment and decree of this court.