PROVOSTY, J.
The shavings produced by a planing mill accumulate so fast that they will soon block up the mill unless they are gotten rid of in some way. This led the defendant company to propose to plaintiff that he and it enter into the following contract:
“Kentwood, La., October ^27, 1906.
“Edwin Kennon, Kentwood, La. — Dear Sir: To confirm our agreement in accordance with conversation between the writer and yourself, we agree to furnish all the surplus shavings which we accumulate at our new planing mill on the following basis:
“You to pipe at your expense the necessary distance from the south end of our planing mill to your property or where you wish to deposit these shavings and in addition thereto we are to receive twenty-five ($25.00) per month for these shavings. This agreement is to be for five years with the privilege of renewal on the same conditions at that time.
“This letter is issued in duplicate and your acceptance on the face of the original letter and the duplicate for your own record serves as a binding agreement, until such time as regular contract is drawn up and duly s:gned by proper o^cer of this corporation.
“Brooks-Scanlon Company,
“By J. S. Foley.
“E. B. Kennon.”
“Memorandum of agreement made and entered into between Brooks-Scanlon Company, a corporation organized under the laws of Minnesota and domiciled in the city of Minneapolis, said state, party of the first part, and Edwin B. Kennon, a resident of the city of Kentwood, state of Louisiana, party of the second part:
“Witnesseth, that party of the first part hereby sells and agrees to deliver as hereinafter specified to said party of the second part, all the shavings manufactured at its new planing mill, not required for its own use in the operation of said mill; said shavings to be delivered to the electric light plant of the said party of the second' part where same stands now, through a galvanized iron blowpipe to be connected with the blowpipe system of said planing mill of the party of the first part. Said blowpipe to be constructed, properly connected *123 and maintained by and at the expense of the said party of the second part. It being understood that said party of the second part shall have the privilege of extending said pipe over and across the lands of the said party .of the first part, during the life of this contract. Said pipe to be and remain the property of the party of the second part.
“It is further agreed and understood that if for any reason said party of the second part shall be unable to receive or take care of said shavings, said party of the first part shall, at its option, have the privilege of using the blowpipe for a reasonable length of time until other disposition can be made of the refuse shavings.
“For and in consideration of the above, said party of the second part hereby agrees to pay the party of the first part, the sum of twenty-five dollars ($25.00) per month payable monthly, for all shavings so delivered. It being understood and agreed that should said planing mill be shut down at any time for a period exceeding one week a proportionate amount shall be deducted from the amount to be paid monthly by the said party of the second part.
“It is agreed and understood that this contract is to be and remain in full force and effect for and during a period of five years from date hereof, with privilege of renewal by notice thirty (30) days before the expiration of said contract, for another five years and is to be binding upon the parties hereto, their heirs, administrators, executors and assigns for and during the time aforesaid.
“In witness whereof, both parties have hereunto set their hand and seal in the presence of T. H. Loggins and Geo. F. Hawley, lawful witnesses, this 19th day of November, A. D., 1906. Brooks-Scanlon Company,
“By John Schull, Treas.
“E. B. Kennon.”
The operations under this contract went on satisfactorily for 18 months, until an increase in the number of planing machines in defendant’s mill, and an expediting of the operation of the mill, with a corresponding increase in the quantity ol; shavings produced, created the necessity of some new arrangement being made for getting rid of the shavings. The blowpipe, owing to its insufficiency for taking care of the increased quantity of shavings, or to the greater power required for blowing the larger volume of shavings through it, would clog, and the mill would have to stop, or some of the planing machines would have to be stopped, or else the lumber running through them would have to be of smaller size, so as to produce a less quantity of shavings. This increase in the capacity of the mill, and the expediting of its operations, had become necessary as a consequence of a cyclone having blown down a much larger number of trees than could be taken through the mill as theretofore operated before the trees would deteriorate. Defendant proposed to plaintiff to discontinue the use of the blowpipe, and to use a wagon in its place for delivering the shavings in the bin of the plaintiff’s electric light plant where the blowpipe had been delivering them, all at the defendant’s expense; and, plaintiff refusing to consent to this change, defendant made it nevertheless. Plaintiff received the deliveries by the wagon, but under protest, and brought suit on the equity side of the District Court of the United States to compel defendant to carry out the contract.
To that suit the defendant filed a demurrer. The District Court sustained the demurrer without assigning reasons. Plaintiff appealed to the United States Circuit Court of Appeals, and that court affirmed the judgment, assigning as its reasons that the contract was lacking in mutuality, and, moreover, was not of a nature to justify a court of equity in ordering specific performance. See this judgment transcribed at page 518 of 132 La., at page 556 of 61 South.
Its date was March, 1911. On May 21 of that year defendant notified plaintiff that, in view of this judgment, which held the contract to be null for want of mutuality, the delivery of shavings would be discontinued at the end of the current month. Accordingly at the end of that month defendant discontinued the deliveries. And plaintiff thereupon brought the present suit claiming damages for breach of contract.
*125 A plea of res judicata founded upon said judgment of the United States Circuit Court, and a plea of no cause of action, were filed by defendant, and were sustained by the trial court, and plaintiff’s suit was dismissed. Plaintiff appealed to this court; and this court set aside the judgment, and remanded the case for trial. See Kennon v. Brooks-Scanlon Co., 132 La. 518, 61 South. 556.
On September 23, 1911, while the present suit was pending, plaintiff had given notice to defendant that he desired to renew the contract for 5 years more; and on June 30, 1913, after the case had been remanded, plaintiff filed a supplemental petition, claiming additional damages. In the original petition plaintiff claimed $75,600 damages for failure to deliver all the shavings produced by the mill and not required for its use from December 1, 1908, to April 15, 1911, being at the rate of $7.50 per carload of shavings, and $2,000 for the cost of the blowpipe; and in the amended petition plaintiff claims $163,440, for the shavings not delivered during the 5 years, for which the contract was renewed.
Defendant filed pleas of res judicata and no cause of action to this amended petition, and contends that these same pleas filed to the original petition were not overruled by this court when this case was here on the first appeal and that said pleas should, now be sustained, and the suit dismissed. The trial court overruled the pleas, and defendant answered to the merits, and the case was tried, and resulted in judgment against de: fendant for $15,188.25. The exception of no cause of action is based on the supposed nullity of the contract for want of mutuality of obligation.
These pleas are the first matters, in regular order, to be considered.
[1] These pleas, as applicable to the original petition, were the very matters presented to the court for decision on the former appeal. The pleas had been sustained by the trial court, and the suit dismissed; and this court, in disposing of the case, had necessarily either to sustain or overrule them. There was no middle ground. To sustain either of them, or not to overrule both, would necessarily cause a dismissal of the suit. The court not having sustained either of them, but having, on the contrary, reversed the judgment appealed from, which had sustained them, and having remanded the case for trial on evidence to be adduced, necessarily overruled both pleas. The. wording .of the decision is not as clear as it might have been made, but no amount of verbiage could alter the legal situation, which was that the pleas had to be either sustained or overruled; that if either of them was sustained, or both not overruled, the suit had inevitably to be dismissed; that by reversing the judgment which had sustained them, and remanding the case for trial, the court necessarily overruled them. The judgment which had sustained the pleas could not in the nature of things be reversed without the pleas being overruled; and neither of the pleas could in the nature of things be sustained without the suit being; as a consequence, dismissed.
Under these circumstances, the matter of the plea of res judicata is necessarily concluded by the judgment on this former appeal, and is no longer open to discussion.
And this is true of said plea also in so far as the demand of the amended or supplemental petition is concerned, for this petition does not propound a new cause of action, but merely brings into the suit the damages alleged «to have continued to accrue from the same cause of action.
[2, 3] And what is here said of the plea of res judicata applies equally to the plea of no cause of action. For actions speak louder than words, and even a Supreme Court protests in vain that it is not doing a thing when *127 it is as a matter of fact actually doing it. A judgment cannot be set aside on appeal unless erroneous, and a commutative contract, lacking mutuality, is void, and cannot possibly give rise to damages by its breach. When therefore the court on said appeal set aside the judgment which had sustained the plea of want of mutuality, and remanded the case for trial on the question of damages, it necessarily overruled the plea of want of mutuality, and decided that there was mutuality and a valid contract, its verbal protest to the contrary notwithstanding. However, since the court did say that the plea of want of mutuality .was left open for reconsideration we will consider it.
[4] On the part of the plaintiff the evident object of this contract was to procure fuel for his electric light plant, and on the part of defendant it was to get rid of the shavings without expense; the $25 monthly payment being stipulated, in all probability, as representing the estimated expense of blowing the shavings.
' Plaintiff was not to be at liberty to refuse at pleasure to receive the shavings, but oply if from any cause he was “unable” to do so. Smith v. Morse, 20 La. Ann. 220; Landeche v. Sarpy, 37 La. Ann. 835; Nelson v. Barber, 143 La. 783, 79 South. 403.
'fhe entire expense of installation was to. be borne by plaintiff; defendant was to be at no expense in that connection, so that if from any cause plaintiff became “unable” to receive the shavings, and the contract was thereby brought to an end, the defendant would have lost nothing, whereas plaintiff would have incurred the expense of the installation, which proved to be some $1,800. Nay, would even in that event have had the right to the use of plaintiff’s blowpipe and premises “for a reasonable length of time, until other disposition could be made of the refuse shavings.” Defendant was getting rid of the “refuse” without expense to itself; and plaintiff was incurring some $1,800 of expense, and' in addition was subjecting his blowpipe and his land to a right on the part of defendant to use them during a reasonable time' for getting rid of the “refuse” of its mill. Why such a contract as this should be thought to be without mutuality we do not see. A contract has mutuality when the reciprocal obligations under it are serious, and at the time the contract was entered into appeared to the parties to be sufficient. Saunders v. Busch-Everett Co., 138 La. 1049, 71 South. 153. In the case of the present contract the reciprocal obligations of the parties were most unquestionably mutually looked upon as being serious and sufficient, and they were so in fact; plaintiff -got value received in the shavings which he obtained for feeding the fire under the boiler of his electric light plant, .and defendant got value received in the installation which it secured free of expense for,getting rid of the refuse of its mill. Defendant enjoyed the benefit of this contract for eighteen months and could have gone on in the same enjoyment for 8 years longer if it had chosen to do so.
The Barnhart Case, 117 La. 1023, 42 South. 489, so confidently relied upon by the learned counsel for defendant, involved an oil lease in which the obligations of the lessor were counterbalanced by no obligation whatever on the part of the lessee except a cash payment of- $1 for obtaining the lease, and the obligation to pay $2 on exercise of the right reserved to retire at any time from the contract. Manifestly, in the contemplation of the parties in entering into the contract the receiving of these insignificant payments had not been looked upon as constituting the real object of the lessor in entering into the lease, .but what had in their contemplation constituted the real and serious object had been the developing of the land for oil and gas; and, since the latter was left optional with the lessee on payment of the trifling sum of *129 $2, the court concluded that the contract was lacking in mutuality.
The other ease relied on (Goodson v. Yivian Oil Co., 129 La. 955, 57 South. 281) was also decided on its peculiar facts, a recital and analysis of which here would serve no useful purpose. ■
We do not understand that in the suit before the United States court a different conclusion was arrived at on this point. As we understand that decision, the conclusion there reached was that the contract, while perhaps enforceable at law, was lacking in that full mutuality which would justify a court of equity in lending its aid for enforcing the specific performance of it.
But when we come to consider the case on its merits we are struck at once by the utter extravagance of the amount ’of damages claimed by plaintiff. The record leaves no doubt whatever that at the time the contract was entered into the shavings in question were considered to be of no value whatever except in so far as it might be economical to use them in place of other fuel under the boiler of defendant’s planing mill and plaintiff’s electric light plant near by. Except the part used under the boilers of the defendant’s mill they had up to that time been an occasion of expense in being gotten rid of by being blown to a fire pile and burnt, and not of profit. 'Doubtless before this contract had been entered into instead of thus burning them in pure waste, defendant would have been perfectly willing to let plaintiff have as much of them gratis as he might have wanted for fuel if plaintiff had been willing to handle them by means of a wagon. And when plaintiff installed the blowpipe for conveying them economically to the furnace of his boilers, he thus utilized only about one-tenth of them: the other nine-tenths being conveyed by means of a fork in the blowpipe to a fire pile to be there consumed in pure waste. And this went on for 18 months. During that time plaintiff had succeeded in disposing of some to the local ice plant, and also for a short time to another plant, and of an insignificant quantity for other uses. When plaintiff filed his suit in the United States court in December, 1909, 3 years and 1 month after the contract had been entered into, he alleged, under oath, that these shavings were “not a staple article or produce, having a fixed value upon the market; that the same is not generally for sale upon the market at all; that up to a very short time ago same was considered of little or no value, and of no use.” So true is it that these shavings were considered to be of no value that in making the contract plaintiff expressly stipulated the right to discontinue receiving them “if for any reason,” he should “be unable to receive or take care” of them, meaning, evidently, if the use of them for fuel in his plant ceased to be economical.
In this suit in the United States court plaintiff alleged on his application for a rehearing, as follows:
“That your petitioner has no adequate remedy at law, first, because the shavings to which your petitioner was entitled under his contract, cannot be replaced; second, because their market value cannot be calculated; third, because it is impossible to estimate the damages caused to your petitioner by the refusal of the BrooksSeanlon Company to complete its contract with petitioner on the terms agreed on.”
Between the time of the filing of those allegations and’the time of the filing of the present suit no change had taken place in the situation, so far as the record shows; and yet we find the petitioner in the present suit fixing the amount of the damages at $239,060. The inconsistency between plaintiff’s allegations in that suit and in this is as glaring as the amount of damages claimed is extravagant.
Ordinarily the measure of damages for the vendor’s breach of his contract is the difference between the contract price and the mar *131 ket price of the commodity sold. The shavings never had a market value; hence that rule is totally inapplicable to this case. Apart from their use as fuel for plaintiff’s plant they had value to amount to anything only in the proportion in which plaintiff might succeed in inducing industrial plants to adopt them as fuel. This because of their lack of density, their featheriness, as a consequence of which they could be used profitably only in great bulk, whereby the handling of them in commercial use was made well-nigh prohibitively expensive. And, moreover, industrial plants could adopt that kind of fuel only by making changes in their furnaces for adapting them to it. I-Iow far plaintiff could have succeeded in inducing any number of them to do this is left by the record entirely to be conjectured. Defendant has used its best endeavors in that direction; and, although in a much better position thán plaintiff would have been in for succeeding— it being a very large lumber concern of long standing, with business connections throughout the country, and the producer of the shavings, and able to mix with them ground wood called “hog product,” rendering them much more available as a commercial article — it has had but partial success; has had to continue to burn a large proportion of them on a fire pile in pure waste as in the past, and as plaintiff had to do while he had the full opportunity to dispose otherwise of them.
Plaintiff measures his damages by taking the price per carload, $10, which the defendant company has been receiving from the Magnolia Cotton Mills, and estimating the quantity of shavings that have been and would be produced by the mill, and estimating what would have been the cost to him of loading the cars. He assumes that his estimates of quantity are sufficiently certain to serve as a basis for judgment, and assumes that he would have had cars regularly for all shavings he would have wanted to ship, and customers for the entire output of the mill.
There is uncertainty as to the quantity of the shavings produced by the mill, and still greater uncertainty as to what part of the shavings produced was required for defendant’s own use in the operation of its mill. Under- the contract, only the surplus was to be delivered to plaintiff. Thére is also uncertainty as to the ability of the plaintiff to have had satisfactory railroad service, or to have found customers for any considerable part of the shavings, let alone for all, or for what part, and, of course, plaintiff can recover only for the value of the shavings he could have used himself or disposed of at a profit, and the amount of this profit would have to be established with reasonable certainty. Dwyer Bros. v. Tulane Educational Fund, 47 La. Ann. 1233, 17 South. 796; Armistead v. Shreveport & R. R. Val. R. Co., 108 La. 171, 32 South. 456. Profits dependent on the chance of securing purchasers for an article the market for which would have to be created-, are too uncertain to serve as a basis for judgment. “When profits are spoken of as not recoverable, reference is generally had to the profits of dependent and collateral engagements, or those contingent upon future bargainings, speculations or states of the market.” 8 R. C. L. 504.
“In Atchison, T. & S. F. R. Co. v.'Thomas, 70 Kan. 409, 78 Pae. 861, the defendant had given the plaintiff the right to sell 4,800 watches of a certain model to the defendant’s employees, and had agreed to collect for the plaintiff’s orders which might be given by its employees in payment for such watches. Subsequently, and after 726 watches had been sold, the defendant refused longer to collect employee’s orders. Recovery of the loss of anticipated profits on the remainder of the watches was denied as too speculative, remote, and contingent, there being no agreement or assurance on the part of the defendant that the plaintiff would be able to sell any specific number of watches. The court, referring to earlier Kansas cases in which recovery of lost profits *133 had been allowed, said that in each of them the business upon which profits were allowed was not new or untried, but had been established and carried on to such an extent in the community that a safe basis of calculation could be found.” S L. R. A. (N. S.) 256.
“Whenever profits are spoken of as not a subject of damages, it will be found that something contingent upon future bargains, or speculations, or states of the market, are referred to, and not the difference between the agreed price of something contracted for and its ascertainable value, or cost.” Philadelphia, W. & B. R. Co. v. Howard, 54 U. S. (13 How.) 307, 14 L. Ed. 157.
The remarks of Mr. Justice Story iu Schooner Lively, 1 Gall. 315, quoted in Griffin v. Colver, 16 N. Y. 492, 69 Am. Dec. 720, are very apposite in the present connection:
“Independent, however, of all authority, I am satisfied upon principle that an allowance of damages, upon the basis of a calculation of profits, is inadmissible. The rule would be in the highest degree unfavorable to the interests of the community. The subject would be involved in utter uncertainty. The calculation would proceed upon contingencies, and would require a knowledge of foreign markets to an exactness in point of time and value which would sometimes present embarrassing obstacles. Much would depend upon the length of the voyage and the season of the arrival, much upon the vigilance and activity of the master, and much upon the momentary demand. After all, it would be a calculation upon conjectures, and not upon facts.”
The quantity produced, by the mill was uncertain for several reasons: The mill was not operated regularly; the quantity of shavings produced varied a good deal according to the kind of lumber that -was being run through the machines; and the amount of the surplus was still more uncertain because the consumption by the mill under its boilers varied according to the quality of the shavings.
The railroad service was more or less unreliable because' of the inability of the railroad to furnish cars or transportation at certain times when the traffic was congested. And yet for a satisfactory use of shavings as fuel under boilers a regular or dependable supply was requisite. Even to the Magnolia Mills, only 15 miles distant, defendant found it impossible to satisfy entirely this requirement of regularity. Eor overcoming in part this difficulty the defendant company provided itself with cars of its own; but the hauling of the cars remained a matter dependent upon the conditions of the traffic upon the railroad.
The estimates of plaintiff as to the quantity of shavings that had to be delivered under the contract are so unreliable that no practical man would, we are sure, think for a moment of adopting them as a basis for fixing the lump price of a sale, and no court as a basis for judgment.
[5] Realizing the inadequacy of the evidence produced by him on this point for attaining the degree of certainty required in a suit of this kind for making out a case, the plaintiff resorts to the contention that the burden lay with the defendant to make the proof of what was the surplus of shavings, because of the better opportunity defendant had for ascertaining what this surplus was. In support of that contention, his learned counsel rely upon the eases of Crescent City Ice Co. v. Ermann, 36 La. Ann. 841; Pruyn v. Sheriff, 51 La. Ann. 323, 25 South. 125; Bastrop Bank v. Levy, 106 La. 586, 31 South. 164; Johnson v. Levy, 109 La. 1036, 34 South. 68. In the first of these cases, the plaintiff ice company, located in New Orleans, sued for the price of a number of shipments of ice made to the defendant, an ice dealer in a distant city. The defense was that the ice had not been sold to defendant, but to some one else who had sold it to defendant. Plaintiff called upon defendant to produce the invoices; and the defendant failed to do so. The court said:
“The presumption is always and inevitably against a litigant who fails to furnish evidence within his reach, and it is the stronger, when *135 the documents, writings, etc., would be conclusive in establishing his case.”
In Pruyn v. Sheriff, 51 La. Ann. 323, 25 South. 125; the issue was as to simulation vel non of a sale of real estate. The vendor having continued in possession, the court held that this shifted the burden of proof to the purchaser to show the reality of the sale, and that this burden was not discharged by the single testimony of the purchaser, but that as the vendor could have been called as a witness, and was not called, the inference was that if he had been called his testimony would have not corroborated that of the purchaser. In Bastrop Bank v. Levy, 106 La. 586, 31 South. 164, the bank sued defendant for an overdraft. The check of the defendant showed what amount had been drawn; but the amount of the deposits could not be shown positively because the cashier by whom alone this-proof could have been made was dead. The bank having made out a prima facie case by the production of its books and of evidence showing the inability of defendant to have made larger deposits than those credited to him, and by showing that he had failed to claim further credits when before suit brought the offer was made to him to allow whatever further credits he might be able to substantiate, whereas he had admitted that he knew that he had overdrawn .his account, the court held that the burden of proof had shifted to him, and that his failure to go upon the stand, although present at the trial, would be construed into an inability on his part to testify to the contrary of the claims of the plaintiff. In Johnson v. Levy, 109 La. 1036, 34 South. 68, the court said:
“The contention of the defendants that the accommodation drafts drawn on Jacques Levy by Armand Levy were in the name of the latter alone is negatived by the testimony. Many of them were drawn by him in the name of Marx Levy & Bro.
“If it were as defendants contended for, the evidence was accessible to them to show it conclusively. They took the testimony of Jacques Levy under commission, and as he had paid the drafts he had them in his possession, and the best evidence as to the manner of their drawing would have been the production of the drafts themselves. This was not done. 1-Iis counsel did not call for them.
“When effective proofs are within the reach of a .party and he fails to produce them, a presumption is raised that they would, if produced, make against him.”
These decisions do not dispense a plaintiff from making his case certain, or require the defendant to make it certain for him, even though the means of making such proof was more available to defendant than to plaintiff. They merely apply the principle of evidence which is expressed in 10 R. O. L. 902, as follows:
“As a general rule the. omission by a party to produce important testimony relating to a fact of which he 'has knowledge, and which is peculiarly within his own reach and control, raises the presumption, open to explanation of course, that the testimony, if produced, would be unfavorable to him.”
At page 884 of the same work this principle is expressed as follows:
“The conduct of a party to a cause may be of the highest importance in determining whether the cause of action in which he is plaintiff, or the ground of defense if he is defendant, is honest and just; just as it is evidence against a prisoner that he has said one thing at one time and another at another, as showing that the recourse to falsehood leads fairly to an inference of guilt. Anything from which such an inference can be drawn is cogent and important evidence with a view to the issue. And so it has become a well-established rule that where evidence which would properly be part of a case is within the control of the party whose interest it would naturally be to produce it, and, without satisfactory explanation, he fails to do so, the jury may draw an inference that it would be unfavorable to him. Lord Mansfield’s maxim ‘all evidence is to be weighed according to the proof which it was in the power of one side to have produced and in the power of the other to have contradicted,’ has frequently been quoted with approval. Neglect to produce demonstrative evidence by *137 a party who has it in his power justifies the inference that it would operate to the prejudice of his contention.”
Elliott on Ev. yol. 1, p. 194, par. 141, as follows:
“It is frequently said that a party is not bound to prove a negative, nor a fact peculiarly within the knowledge of the opposite party, and that the latter may have the burden of disproving it, but the mere form of an averment is of little consequence, so far as the rule as to the burden of the issue is concerned, and if, in. order to establish his case and move the court in his favor, a party must prove a negative, the burden is usually upon him to do so. As a rule it is only where the fact negatived is peculiarly within the knowledge of the adversary that the burden is, in any sense, shifted to the latter, and even then it is the burden of going forward rather than the burden of ultimately establishing the case. The fact that the party having peculiar knowledge of a matter fails to bring it forward may raise a presumption or justify an inference in favor of his adversary’s claim, and thus shift the burden of proceeding in order to win; but the burden of establishing the issue is not shifted, nor is it, ordinarily, determined in the first instance by the mere fact that a negative is involved, or that some fact is peculiarly within the knowledge of the adverse party.”
Whatever evidence defendant had in its possession was on its books, and was available to plaintiff upon request; in fact, was called for and produced. Defendant did not have to keep an account of the shavings, if such a thing had been possible, in order that the data thus procured might be at hand for proving up plaintiff’s case; nor was defendant under any obligation whatever to take any steps for ascertaining what was the quantity of shavings produced, and what quantity was consumed by the mill. Defendant had a perfect right to take no steps towards getting up evidence until plaintiff had made out a case. Counsel say that every presumption must be against defendant. But if every presumption were indulged, the quantity of shavings produced by the mill and the quantity consumed by it would be as’ uncertain as ever.
Plaintiff sold some shavings locally, but, apart from this, never was in a position to dispose of any at a profit. He says it was because he was not equipped with the facilities for loading them into the railroad cars; but during the 18 months during which he was receiving delivery by the blowpipe he did not provide himself with these facilities, and by the time the contract was discontinued he liad not progressed in that direction beyond having a survey made for laying a switch track and getting estimates of the cost. How long the providing of. these facilities would have taken is not shown; in fact, whether plaintiff would have ever considered the prospect of disposing of the shavings by rail shipment as justifying the outlay is left in doubt by the circumstances of the case taken as a whole. On cross-examination plaintiff was asked to state where he could have disposed of the shavings. He answered:
“To other plants where they were generally consumed. Q. Name them? A. I think this plant here would have used some of them. Q. You think so? A. Yes, sir; I had a man in charge here; said he could use them. Q. Who else? A. And also the Hammond Ice Manufacturing & Power Plant, the light plant at Hammond. Q. The light plant in Hammond is run by Mr. James Jummonville, and the one in Amite? A. By Mr. Richardson. Q. Did you have an offer from them, or either of them, to take any of the business — shavings made by the planing mill of Brooks-Scanlon Company? A. If I could load them in the cars, they wanted enough to supply their requirements to run the plant on. Q. Is that proposition made in writing? A. No, sir.”
We have not been able to ascertain from the record what plant the plaintiff had reference to by the expression “this plant here”; and beyond the statement just quoted there is nothing in' the record to show that the Amite plant would have taken any shavings. Mr. James Jummonville of the Hammond plant was called by plaintiff as a witness. He testified that he used slabs and “hog product” at his plant, and at no time contemplated a *139 change of fuelthat he remembered having had a talk with Mr. Kennon “several years ago,” but does not remember the nature of it; that he uses no shavings, and same would be more expensive than slabs or “hog product.” The evidence shows that shavings as fuel is not desirable for a plant unless a regular supply can be assured, and that this is difficult because of the uncertainty in securing cars, and the irregularity in the running of the planing mill. The defendant company, selling shavings and “hog product” to the Magnolia Mills, has not been able to do so satisfactorily, owing to the difficulties here mentioned. To obviate one of these difficulties, the defendant company has provided cars of its own. Whether plaintiff would have been willing to incur this expense is not certain. Whether plaintiff could have sold any shavings except locally by wagon delivery is not certain. What amount could have been disposed of locally, except to the Kentwood Ice Plant, is left altogether uncertain.
We find ourselves entirely unable to fix the damages suffered by plaintiff in any amount whatever. Not even the value of the shavings to be consumed in his own plant. Not even the value of the blowpipe after the1 storm had blown it down, except that part of it known as the “dust collector,” which was not damaged, and cost “in the neighborhood of $125,” and which if the contract had not been breached, and the blowpipe had been restored, would have continued, we assume, to represent that much value, but which, except as a part of the blowpipe system, was mere scrap iron and worthless.
To that extent plaintiff’s case may be considered to be established with sufficient certainty for judgment.
It is therefore ordered,. adjudged, and decreed that the judgment appealed from be reduced to $125, and that, as so reduced, it be affirmed; plaintiff to pay the costs of appeal.
MONROE, O. X, takes no part.